**HEARTS ON FIRE COMPANY, LLC, Plaintiff,**

v.

**BLUE NILE, INC., Defendant.**

**Civ. Action No. 08cv11053–NG.**

United States District Court, D. Massachusetts.

March 27, 2009.

Leota L. Bates, Perkins Coie LLP, Washington, DC, Dennis N. D'Angelo, Mark S. Puzella, Goodwin Procter LLP, Boston, MA, Elizabeth L. McDougall, Perkins Coie LLP, Seattle, WA, for Defendant, Blue Nile, Inc.

Zachary N. Coseglia, Bruce E. Falby, Robert P. Sherman, DLA Piper U.S. LLP, Boston, MA, for Plaintiff, Hearts on Fire Company, LLC.

## MEMORANDUM AND ORDER RE: MOTION TO DISMISS

GERTNER, District Judge:

This case raises complex allegations of trademark infringement on the internet—through the use of trademarks in search engines, in sponsored links, and on commercial websites. The Plaintiff, Hearts on Fire Co., LLC ("Hearts on Fire"), principally claims that one of its competitors, Blue Nile, Inc. ("Blue Nile"), committed trademark infringement when it used the Plaintiff's trademark as a keyword to trigger search engine advertisements known as "sponsored links." While sponsored linking is a common form of internet advertising, the use of a competitor's trademark to trigger these links has generated both litigation and academic debate.[1]

The Complaint encompasses three different uses of the Plaintiff's mark by Blue Nile: (1) the Defendant's purchase of the trademark as a search engine keyword, which displayed a sponsored link directing the computer user to Blue Nile's website whenever the phrase "hearts on fire" was entered as a search-term, (2) the display of trademarked text in the Blue Nile advertisement attached to the sponsored link, and (3) the search results list generated within the Blue Nile website when the computer user searches there for the phrase "hearts on fire." Together, the Plaintiff argues, these uses constitute a course of conduct likely to confuse internet shoppers, improperly diverting them to its competitor's website.

The Defendant has filed a Motion to Dismiss (document # 5). Significantly, the Defendant's present motion is not directed toward Plaintiff's allegation that the trademark "hearts on fire" appeared alongside

---

1. *See, e.g.,* Stacey Dogan and Mark Lemley, Trademarks and Consumer Search Costs on the Internet, 41 Hous. L.Rev. 777, 814 (2004).

Defendant's sponsored link. *See* Compl. ¶ 21. Blue Nile agrees that this allegation, if true, amounts to infringement. Def. Mot. to Dismiss Mem. at 1 (document # 6). Rather, Blue Nile asks this Court to dismiss the Plaintiff's allegation that the Defendant's use of the trademark to *trigger* the sponsored link constitutes infringement under Section 32(a) of the Lanham Act, 15 U.S.C. § 1114. Likewise, the Defendant argues that Plaintiff's third theory is unavailing, because Blue Nile does not use the "hearts on fire" trademark on its own website.

For the reasons below, the Court finds that Blue Nile's adoption of the Plaintiff's trademark as a search engine keyword constitutes a "use" within the meaning of the Lanham Act. To be sure, this use is not, by itself, enough to prove infringement. If the Plaintiff can show that the resulting sponsored links and the content of the Blue Nile website likely led to consumer confusion, Blue Nile's purchase of the search term would meet the requirements of the Act. Accordingly, Blue Nile's Motion to Dismiss is **DENIED.**

## I. *BACKGROUND*

The Plaintiff sells trademarked diamonds and jewelry to authorized retailers, many of whom resell these diamonds online. Compl. ¶ 2 (document # 1). "Hearts on Fire" is a registered trademark of the Plaintiff, and the name of the Plaintiff's diamond company. *Id.* at ¶ 14. The Plaintiff does not sell diamonds directly to the public, though it does "provide services relating to the sale of jewelry," including a public website that promotes the trademarked jewelry and directs customers to authorized dealers of the trademarked diamonds. *Id.* The Plaintiff considers itself a "recognized worldwide industry leader," which has used the trademark "Hearts on Fire" to promote its diamonds since as early as 1996. *Id.*

The Defendant, Blue Nile, operates an online diamond and jewelry retail store where consumers can purchase diamonds. *Id.* at 3. Importantly, the Defendant is not an authorized dealer of Hearts on Fire diamonds and consumers cannot buy the Plaintiff's trademarked diamonds at the Defendant's website. *Id.*

The mechanisms of the alleged infringement, which is based upon keyword purchasing and the display of search engine sponsored links, warrant some description. When a consumer wants to search the internet for information, she or he often begins at a search engine, such as Google or Yahoo. Once there, the computer user types words or phrases into a search box on the search engine website. The search engine then generates a list of web addresses, called a "search results list," that may be relevant to the computer user's interests based on the searched-for word or phrase. Search engines use complex algorithms to search their databases and determine which web addresses will appear in the search results list. These algorithms generally rank the web addresses according to relevancy, using factors such as whether the search terms appear on the webpage and whether previous computer users using that search term have decided to click on the link to the web address. *See Jackson v. Scotts Co.,* 2009 WL 321010, at *6 n. 32 (S.D.N.Y.2009) (citing Preston Gralla, How the Internet Works 192 (7th ed. 2004)); *Playboy Enters., Inc. v. Netscape Comm'ns Corp.,* 55 F.Supp.2d 1070, 1077 (C.D.Cal.1999).

In addition to search results based on relevancy, many search engines also display so-called "sponsored links" on their results page. These sponsored links are a form of advertising, by which the search engine permits a company to purchase a keyword or phrase which triggers the paid advertisement. Specifically, when a com-

puter user enters a search that includes the purchased keyword, a link to the website of the company that purchased the keyword, together with a small advertisement, appears near the top of the results list displayed. This listing is usually demarcated, quite accurately, as a "sponsored link." All in all, purchasing a keyword allows a company to circumvent the search engine's usual relevancy factors and prominently display its sponsored link to internet users.

In this case, the Plaintiff alleges that the Defendant paid a search engine, www.webcrawler.com, to display a sponsored link with the web address of the Defendant's website when a computer user searched for the phrase "hearts on fire." Compl. ¶ 21. The text of the sponsored link, which included the Plaintiff's trademark, reads as follows:

Ideal Cut Diamonds at Blue Nile

Find hearts on fire diamonds at Forbes Favorite Online Jeweler.

Sponsored by: www.bluenile.com.

*Id.* The Plaintiff also alleges that the Defendant has used the "hearts on fire" keyword to trigger Blue Nile sponsored links that do *not* include the trademark in their text. *Id.* at ¶ 23. In either case, if the internet user clicks the sponsored link and proceeds to the Defendant's web address, www.bluenile.com, the Blue Nile website contains an internal search engine that exclusively searches web pages within the Defendant's website. If the computer user then types the trademarked phrase into the Defendant's search box, a list of search results containing the individual words of the trademark are displayed— i.e., a list of webpages with the words "hearts" or "on fire"—albeit none of these results containing the exact trademarked phrase. *Id.* at ¶ 24.

The Plaintiff alleges that these uses of its mark, either separately or together, constitute trademark infringement under Section 32(a) of the Lanham Act, 15 U.S.C. § 1114,[2] unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[3] unfair competition at common law, and unfair and deceptive practices under M.G.L. ch. 93A. Compl. ¶ 37. Plaintiff is harmed because Defendant's use of the "hearts on fire" trademark confuses consumers, diverting potential internet customers from their original intent to buy the Plaintiff's diamonds and directing them instead to the Defendant's website. *Id.* at ¶ 27. Whether this diversion—achieved through the purchase of sponsored links triggered by the trademarked phrase— constitutes trademark infringement is the central issue here.

**2.** Section 32(a) of the Lanham Act, 15 U.S.C. § 1114, provides in pertinent part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive—shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**3.** Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part:

Any person who ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false, or misleading description of fact, or false or misleading representation of facts, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

## II. STANDARD OF REVIEW

In deciding whether to grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6), this Court must determine whether the Plaintiff has stated a claim upon which relief can be granted. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must accept as true the claims in the complaint, with all reasonable inferences drawn in favor of the Plaintiff. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of its claim. *See Miranda v. Ponce Fed'l Bank*, 948 F.2d 41, 44 (1st Cir.1991) (citing *Conley*, 355 U.S. at 45, 78 S.Ct. 99). The Plaintiff's factual allegations, however, must be more than speculative, and require more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Thus, dismissal would be appropriate if "it appears from the facts alleged that the claimant cannot recover on any viable theory." *Rumford Pharm., Inc. v. City of East Providence*, 970 F.2d 996, 998 (1st Cir.1992).

## III. DISCUSSION

The Defendant has filed a partial motion to dismiss, seeking to eliminate the first and third theories of trademark violation that the Plaintiff pursues, namely the Defendant's purchase of the "hearts on fire" trademark as a keyword to trigger sponsored links, and the results when "hearts on fire" is entered into the Defendant's internal search engine. As described above, the Defendant has not challenged the allegation that the sponsored link's display of the exact trademarked phrase as part of the accompanying advertisement, if proved, would amount to a trademark violation.

### A. The Lanham Act

The Lanham Act, 15 U.S.C. §§ 1051 et seq., serves two basic purposes: foremost, preventing the use of similar or identical marks in a way that confuses the public about the actual source of the goods and services; and second, the protection of the goodwill that companies have built up in their trademarks. *See, e.g., ICEE Distribs., Inc. v. J & J Snack Foods Corp.*, 445 F.3d 841, 846 (5th Cir.2006); S.Rep. No. 1333, 79th Cong.2d Sess., *reprinted in* 1946 U.S.Code Cong. Serv. 1274–76 (stating that the Lanham Act would "secure trademark owners in the goodwill which they have built up and ... protect the public from imposition by the use of counterfeit and imitated marks"). To establish liability, the Plaintiff must ultimately prove that (1) it owns and uses the "Hearts on Fire" trademark; (2) the Defendant used the trademark without the Plaintiff's permission; and (3) the Defendant's use was likely to confuse consumers, thereby causing the Plaintiff harm. *See Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 60 (1st Cir.2008). While the Plaintiff has clearly pleaded facts sufficient to show that it owns the trademark, the parties debate whether the keyword purchase constitutes a "use" under the Lanham Act and what standard of confusion the Plaintiff must meet.

### B. The "Use" Requirement

As an initial matter, this Court must resolve whether the purchase of a trademarked keyword to trigger a sponsored link constitutes a "use" of that trademark, as the first prong of the Lanham Act requires. The circuits have split on the issue; the First Circuit has not yet squarely decided such a case.[4]

---

4. The First Circuit recently considered a similar, though not identical, case of internet

trademark infringement, where the defendant

At present, the Second Circuit stands alone in holding that the purchase of a competitor's trademark to trigger internet advertising does *not* constitute a use for the purposes of the Lanham Act. The pivotal case, *1–800 Contacts, Inc. v. WhenU. Com, Inc.*, did not involve sponsored links as here, but rather a different form of internet advertising known as "pop-up ads." 414 F.3d 400 (2d Cir.2005); *see also Merck & Co. v. Mediplan Health Consulting Inc.*, 425 F.Supp.2d 402 (S.D.N.Y.2006) (applying rationale of 1–800 Contacts to sponsored links). In *1–800 Contacts*, Vision Direct, a phone directory company and competitor of 1–800 Contacts, Inc., paid WhenU.com to display a pop-up advertisement on a computer user's screen whenever he or she entered "www.1800 contacts.com" as a web address. *Id.* at 405. The pop-up ad created a new window with Vision Direct's advertisement, temporarily blocking the 1800contacts.com website from view. *Id.*

Crucially, the Second Circuit held that the www.1800contacts.com web address was "similar, but not identical" to the company's protected trademark, "1–800 CONTACTS." *Id.* at 408. Likewise, because the pop-up advertisement did not actually display the 1–800 Contacts trademark anywhere in its text, the Second Circuit held that there was no "use" of the trademark within the meaning of the Lanham Act.[5] In this view, only the web address—not the trademark itself—was used to trigger the Vision Direct advertisement, and even that use was confined to an internal software directory never seen by the internet user. As such, the Second Circuit found that the pop-up ad did not rely on any use of the trademark itself, nor did it create any possibility of "visual confusion" with 1–800 Contacts' mark. *Id.* at 409.

While *1–800 Contacts* carefully distinguished the pop-up advertisement context from the keyword context, *id.* at 410, lower courts in the Second Circuit have gone further. They have applied that same reasoning to keyword cases, holding that a company's purchase of a competitor's trademark to trigger sponsored links does not qualify as a "use." *Merck & Co. v.*

company had allegedly embedded in its website invisible HTML code, or "meta-tags", containing its competitor's trademark, in order to attract increased search engine traffic. *See Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56 (1st Cir.2008). In its analysis, however, the First Circuit focused exclusively on the second prong of the Lanham Act, the likelihood of consumer confusion. *Id.* at 60–62. It assumed, without deciding, that the defendant's embedding of the trademark in invisible meta-tags qualified as a "use" under the first prong of the Lanham Act, despite the fact that consumers do not see such embedded marks. *See id.* at 60 n. 5 ("Further, McGills concedes that, without Venture's permission, Gallagher embedded the marks verbatim on the McGills website."). With this question still unresolved, this Court is obliged to conduct an independent inquiry into whether the "use" requirement has been met here, reaching a conclusion consistent with the First Circuit's assumption in *Venture Tape. Id.* at 60–62.

**5.** The Second Circuit and several district courts therein have relied on the definitions section of the Lanham Act, 15 U.S.C. § 1127, to exclude any use that does not involve the display of the actual trademark. *See Merck & Co. Inc. v. Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402, 415 (S.D.N.Y.2006). The definitions section reads:

[A] mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce ...

*Mediplan Health Consulting Inc.,* 425 F.Supp.2d 402 (S.D.N.Y.2006); *Rescuecom Corp. v. Google Inc.,* 456 F.Supp.2d 393 (N.D.N.Y.2006); *Site–Pro–1 Inc. v. Better Metal LLC,* 506 F.Supp.2d 123 (E.D.N.Y. 2007). Whether such an extension of the Second Circuit's reasoning in *1–800 Contacts,* a pop-up ad case, is warranted in a sponsored-link case like this one is questionable.

Indeed, outside of the Second Circuit, other circuits agree that the purchase of trademarks to trigger banner advertisements on a search results page is a "use" under the Lanham Act.[6] *See Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.,* 354 F.3d 1020 (9th Cir.2004); *Australian Gold, Inc. v. Hatfield,* 436 F.3d 1228 (10th Cir.2006). District courts have followed suit when applying these decisions to the purchase of trademarked keywords to trigger sponsored links. *See Boston Duck Tours, LP v. Super Duck Tours, LLC,* 527 F.Supp.2d 205, 207 (D.Mass.2007) (finding keyword-purchasing a "use" for trademark purposes and collecting cases on both sides); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC,* 2007 WL 30115 (E.D.Pa. 2007) (finding trademark use in sponsored linking but allowing defendant's motion to dismiss on other grounds); *Buying for the Home, LLC v. Humble Abode, LLC,* 459 F.Supp.2d 310 (D.N.J.2006); *Gov't Employees Ins. Co. v. Google, Inc.,* 330 F.Supp.2d 700 (E.D.Va.2004).

Rather than relying only on the Act's definitions section as the Second Circuit has done, *see* note 5, *supra,* these courts often look also to its civil remedies provision, which defines "use" more broadly. *Compare* 15 U.S.C. § 1127 (definitions section), *with* 15 U.S.C. § 1114 (civil remedies provision); *see also Boston Duck Tours,* 527 F.Supp.2d at 207 (finding that "spon-

sored linking necessarily entails the 'use' of the plaintiff's mark as part of a mechanism for advertising," based on the statute's "plain language"). In particular, the civil remedies provision penalizes the "use in commerce" of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark *in connection with* the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114 (emphasis added); *see also* note 2, *supra.* The purchase of a competitor's trademark to trigger search-engine advertising is precisely such a use in commerce, even if the trademark is never affixed to the goods themselves. In effect, one company has relied on its competitor's trademark to place advertisements for its own products in front of consumers searching for that exact mark. The Lanham Act's use requirement is not so narrow or cramped that it would fail to treat this conduct as a "use in commerce."

Even the Act's definitions section, which pre-dates the advent of internet commerce and advertising, treats as a "use in commerce" any use of the trademark on "displays associated" with the goods offered for sale. 15 U.S.C. § 1127. On the facts of this case, by contrast to *1–800 Contacts,* 414 F.3d 400, a computer user's search for the trademarked phrase necessarily involves a display of that trademark as part of the search-results list. For instance, if a computer user searches for the "hearts on fire" trademark at www.webcrawler. com, the text "Web search results for 'hearts on fire'" is prominently displayed above the search results, including the sponsored links. Indeed, this display is exactly what the Defendant paid for: the association of Blue Nile's sponsored link with the searched-for trademark.

In light of the Lanham Act's language and the broader purposes of the trade-

---

**6.** Unlike a sponsored link, banner advertisements are not displayed as part of a search results list, but instead often occupy the margins of a webpage.

mark statute, there is little question that the purchase of a trademarked keyword to trigger sponsored links constitutes a "use" within the meaning of the Lanham Act.

## C. Likelihood of Confusion

■ Although Blue Nile's alleged keyword purchase fulfills the "use" prong of the Lanham Act, it is only one element of trademark infringement and does not constitute a violation in and of itself. The Plaintiff still must prove a likelihood of confusion, which generally involves a far more fact-specific inquiry: whether "the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 201 (1st Cir.1996).

At this stage in the case, there is no suggestion that diverted consumers inadvertently believed they were purchasing Hearts on Fire diamonds at Blue Nile's website. No diamonds appearing on the website purport to be Hearts on Fire diamonds. Rather, Plaintiff relies on allegations of pre-sale confusion to support its infringement claim. *See* Pl.'s Opp. to Mot. to Dismiss at 8–12 (asserting both "traditional" pre-sale confusion and initial interest confusion). Most relevant in light of this partial Motion to Dismiss is Plaintiff's argument that even those sponsored links which did *not* display its trademark likely confused consumers. That is, the simple fact an internet user entered a search for its trademarked diamonds and, in response, received a link to Blue Nile's diamond retail website was enough to confuse the online shopper—even if the sponsored link did not use the trademark in its text

at all. This sequence, according to the Plaintiff, was actionable because it sparked an initial interest in Blue Nile's products, leading its potential customers astray in violation of trademark protections.

### 1. Initial Interest Confusion

■ The Plaintiff argues that the likelihood of confusion prong can be fulfilled in this case by resort to a trademark doctrine called "initial interest confusion." Pl.'s Opp. to Mot. to Dismiss at 11 (document # 12). A somewhat ill-defined concept, initial interest confusion refers to a type of pre-sale confusion that has not been fully explored or addressed by the First Circuit.[7] Generally speaking, pre-sale confusion refers to a potential purchaser's temporary confusion about the actual source of goods or services under consideration, even where that confusion is resolved by the actual moment of sale. There is no question that this type of confusion falls squarely within the scope of trademark violations contemplated by the Lanham Act. In fact, the 1962 amendments to the Act explicitly brought pre-sale confusion within the ambit of trademark protections. Lanham Act, § 32(1)(a), as amended, 15 U.S.C. § 1114(1)(a); Oct. 9, 1962, Pub.L. 87–772, § 17, 76 Stat. 773 (removing the term "purchasers" to expand trademark protection to situations involving pre-sale as well as point-of-sale and post-sale confusion). Obviously, bringing pre-sale confusion within the Act did not lighten plaintiffs' burden of showing confusion. They still must show that "an appreciable number of reasonably prudent consumers" would likely be confused about the source of the marketed goods or services at some point during the pre-sale process. *See Keds Corp.,* 888 F.2d at 222–23.

---

7. *See EMC Corp. v. Hewlett–Packard Co.,* 59 F.Supp.2d 147, 150 (D.Mass.1999) (concluding that the First Circuit had not squarely considered or taken a position on initial interest confusion).

■ Initial interest confusion targets one specific type of pre-sale confusion: It involves confusion at the very earliest stage—not with respect to the source of specific goods or services under consideration, but during the process of searching and canvassing for a particular product. The classic example is where a consumer sets out in search of one trademarked good, but is then sidetracked en route to his or her original destination by a competitor's advertisement or offering. He or she is never confused as to the source or origin of the product he eventually purchases, but he may have arrived there through either misdirection or mere redirection. In effect, initial interest confusion involves the diversion of the consumer's attention from one trademarked good to a competing good, even if he is not confused about the source of the products he ultimately considers or buys.

Early "initial interest confusion" cases in the bricks-and-mortar world involved the use of similar trademarks that might mislead a consumer searching for a particular product. In these cases, which appear relatively rare, the consumer did not buy the item believing that it was the trademarked good. Rather, he was confused at an early point in the pre-sale process. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir.1975) (piano company using similar name to trademarked company misled consumers); *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254 (2d Cir.1987) (oil company with name invoking plaintiff's trademarked logo confused oil traders into investing a considerable amount of time and effort into pre-sale negotiations with the defendant).[8]

As trademark doctrine has evolved, particularly in the internet context, initial interest confusion has been invoked in a widening range of scenarios. One was illustrated by the Ninth Circuit in *Brookfield Communications Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1062 (9th Cir.1999). There, the court compared invisible embedding of the plaintiff's trademark in the defendant's webpage (i.e., meta-tags) to a misleading billboard:

> Suppose West Coast's competitor (let's call it 'Blockbuster') puts up a billboard on a highway reading—'West Coast Video: 2 miles ahead at Exit 7'—where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there.

*Id.* at 1064. In this scenario, the trademark is employed not to fool the consumer about his eventual purchase, but to lead him astray on false pretenses and into the arms of a competitor. The Ninth Circuit held that this use of a competitor's trademark in a meta-tag constituted infringement under an initial interest theory; a number of other courts have followed suit. *See, e.g., Australian Gold, Inc. v. Hatfield,* 436 F.3d 1228, 1239 (10th Cir.2006); *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812–13 (7th Cir.2002); *JR Cigar, Inc. v. GoTo.com, Inc.,* 437 F.Supp.2d 273 (D.N.J.2006). Using a competitor's trademark to lure a consumer off the highway and into one's store, in this view, is little

---

8. As several commentators note, " 'Initial interest confusion' as originally conceived did not reflect a new doctrine; rather, it was a simple recognition that competition-distorting confusion can occur at times other than the point of sale." Stacey Dogan and Mark Lemley, Trademarks and Consumer Search Costs on the Internet; 41 Hous. L.Rev. 777, 814 (2004).

different from confusing the consumer when he steps through the door.

As a hypothetical, the Ninth Circuit's billboard example may state a perfectly plausible case of trademark infringement. One company has used a direct display of its competitor's mark to confuse consumers in a fashion that is costly, sustained, and not easily reversed. Whether the mark is used on the competing goods themselves or on a sign pointing the way makes little difference in the trademark calculus. The culprit has misappropriated the goodwill embodied by the protected mark and has increased consumer search costs through misdirection. But rarely are cases so clear as the Ninth Circuit's billboard—particularly on the internet—and certainly not this one.

Indeed, sponsored link advertising invites a second type of comparison: Initial interest confusion, for example, has been invoked in circumstances where one company "piggybacks" on its competitor's trademark, rewarding his search for one particular product with a choice among several similar items. Infringement is not nearly so obvious from this vantage point. Rather than a misleading billboard, this analogy is more akin to a menu—one that offers a variety of distinct products, all keyed to the consumer's initial search. Sponsored linking may achieve precisely this result, depending on the specific product search and its context. When a consumer searches for a trademarked item, she receives a search results list that includes links to both the trademarked prod-uct's website and a competitor's website. Where the distinction between these vendors is clear, she now has a simple choice between products, each of which is as easily accessible as the next. If the consumer ultimately selects a competitor's product, she has been diverted to a more attractive offer but she has not been confused or misled.[9] While she may have gotten to the search-results list via the trademarked name, once there, the advertised products are easily distinguished.

 In much the same way, keyword purchasing may, in many cases, be analogized to a drug store that "typically places its own store-brand generic products next to the trademarked products they emulate in order to induce a customer who has specifically sought out the trademarked product to consider the store's less-expensive alternative." *1–800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 411 (2d Cir.2005). The generic product capitalizes on the recognizable brand name but the consumer benefits by being offered a lower-cost product. At no point is the consumer confused about the alternatives presented to her. *See generally* Stacey L. Dogan & Mark A. Lemley, Trademarks and Consumer Search Costs on the Internet, 41 Hous. L.Rev. 777, 785 (2004) (arguing that the primary purpose of the Lanham Act is to reduce consumer search costs). The goodwill invested in the protected mark remains undisturbed while the consumer reaps the benefit of competing goods.[10] Trademark infringement would seem to be unsupportable in this scenario.

---

9. Consider, for instance, if Pepsi were to purchase sponsored links to its website triggered by an internet user's search for the "Coca–Cola" trademark. Coca–Cola would have difficulty suing Pepsi for infringement on an initial interest theory because these two products are widely recognized as competitors and, accordingly, the likelihood of consumer confusion is exceedingly small.

10. The Plaintiff argues that the use of its trademark to divert internet traffic capitalizes on the trademark's goodwill. Certainly, protecting a trademark's goodwill is one of the twin goals of the Lanham Act. The Lanham Act "encourage[s] the production of quality products," and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability to quickly evaluate the quality of an item offered

Mere diversion, without any hint of confusion, is not enough.

## 2. Balancing Consumer Confusion and Consumer Search Costs

■ To be sure, the sponsored links appearing on a search-results page will not always be a menu of readily distinguished alternatives. With the intense competition for internet users' attention and mouse-clicks, online merchants may well be tempted to blur these distinctions, hoping to create and capitalize on initial consumer confusion. Such conduct undoubtedly begins to sound in trademark infringement. Thus, where a plaintiff has plausibly alleged some consumer confusion, even at an initial stage of his product search, the question is a far closer one. The First Circuit does view *pre-sale* confusion, generally, as actionable—as the amended statute allows and as most circuits have since

found.[11] 15 U.S.C. § 1114(1)(a). But the First Circuit has never addressed initial interest confusion. *See Hasbro, Inc. v. Clue Computing, Inc.,* 232 F.3d 1, 2 (1st Cir.2000) (crediting the lower court for its "refusal to enter the 'initial interest confusion' thicket"); *EMC Corp. v. Hewlett-Packard Co.,* 59 F.Supp.2d 147, 150 (D.Mass.1999) (concluding that the First Circuit had not squarely considered or taken a position on initial interest confusion); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 290 F.Supp.2d 241 (D.R.I.2003) (collecting initial interest confusion cases), *rev'd on other grounds,* 376 F.3d 8 (1st Cir.2004). But see *Northern Light Tech. v. Northern Lights Club,* 97 F.Supp.2d 96, 113 (D.Mass.2000) (finding initial interest confusion "not cognizable" under the First Circuit's trademark law), *aff'd on other grounds,* 236 F.3d 57 (1st Cir.2001) (without discussion of initial interest confusion).[12] Without First Circuit guidance,

for sale. *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quoting 1 McCarthy, § 2.01[2]). The crux of this second goal, however, is not simply to protect companies, but to do so in furtherance of consumer interests. Unlike patents and copyrights, trademarks are not property rights in gross, but rather "limited entitlements to protect against uses that diminish the informative value of marks." Dogan & Lemley, *supra,* at 778–789 (citing S.Rep. No. 79–1333, at 1–17; *E.I. Du pont De Nemours Powder Co. v. Masland,* 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917)). Their use alone does not result in a violation.

11. In this respect, at least one treatise is simply wrong. *See* Deborah F. Buckman, Annotation, *Initial Interest Confusion Under Lanham Trademark Act,* 183 A.L.R. Fed. 553, § 3 (2007) (suggesting that only point-of-sale confusion is actionable in the First Circuit) (citing *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201 (1st Cir.1983) (rejecting evidence of "temporary" confusion as sufficient to support trademark infringement)). *But see Keds Corp. v. Renee Intern. Trading Corp.,* 888 F.2d 215, 222 (1st Cir.1989) (noting that "point of sale confusion

was not the only issue," but also the potential confusion of "prospective consumers"). Indeed, in *Venture Tape,* a recent internet infringement case, the First Circuit observed that the defendant had "lured" consumers to his website by embedding a competitor's trademark in meta-tags and invisible background text. 540 F.3d at 61 (without addressing initial interest confusion). It did not inquire into whether the record disclosed that consumers had actually purchased the defendant's products and, if so, whether consumer confusion was sustained up to the moment of sale. *Id.* Strong circumstantial evidence of pre-sale confusion was apparently sufficient to sustain summary judgment for the plaintiff.

12. Although the First Circuit cited *Brookfield,* 174 F.3d 1036, in its *Venture Tape* decision for the proposition that proof of actual confusion is not essential to fulfill the confusion prong, it did not address or endorse Brookfield's overall theory of trademark infringement. 540 F.3d at 61–62. Rather, *Venture Tape* clarified the evidentiary requirements for proving a likelihood of confusion, finding that proof of actual confusion was not necessary to prevail on an infringement claim. *Id.; see also infra.*

this Court is obliged to decide whether a plaintiff pleading initial interest confusion may state a claim for trademark infringement. Based on the twin goals of trademark protection, *see* note 10, *supra*, the Court concludes that initial interest confusion can support a claim under the Lanham Act—but only where the plaintiff has plausibly alleged that consumers were confused, and not simply diverted.

Many cases, including this one, will fall somewhere between the incarnations of so-called initial interest confusion discussed above—the misleading billboard or the choice-enhancing menu. The Court's task is to distinguish between them. As a preliminary matter, the Court agrees with the many scholars who find the deceptive billboard analogy often inapt in the internet context. *See, e.g.*, Jonathan Moskin, Virtual Trademark Use: The Parallel World of Keyword Ads, 98 Trademark Rep. 873, 896 (2008); Margreth Barrett, Internet Trademark Suits and the Demise of "Trademark Use," 39 U.C. Davis L.Rev. 371, 427–29 (2006). Unlike the deceived shopper who is unlikely to get back on the highway, the internet consumer can easily click the 'back' button on her web browser and return almost instantly to the search results list to find the sought-after brand. Her added search costs, in other words, may often be very low while her comparative choice among products is greatly expanded.

The ease with which an internet shopper can reverse course counsels against over-expansive trademark protection, as any confusion may be extremely temporary and quickly remedied. *See Hasbro, Inc. v. Clue Computing, Inc.*, 232 F.3d 1, 2 (1st Cir.2000) (per curiam) (observing that the content of Defendant's website strongly indicated that the site had little to do with the Plaintiff's business); *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y.1997) (noting that consumers reaching the defendant's website were falsely led to believe that it belonged to trademark owner and only gradually realized their mistake); *Jews for Jesus v. Brodsky*, 993 F.Supp. 282 (D.N.J. 1998) (same). The choice-enhancing properties of internet advertising should not be stifled on account of fleeting confusion among competing products. Trademark protections must ultimately accrue to the consumer's benefit. *See* Dogan & Lemley, *supra*, at 778–789 (citing S.Rep. No. 79–1333, at 1–17; *E.I. Du pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917)).

The crucial question in these cases is one of degree: Whether the consumer is likely confused in some sustained fashion by the sponsored link and the defendant's website, or whether the link serves instead as a benign and even beneficial form of comparison shopping. The menu analogy described above—where the competing products are clearly distinguished—is not, in and of itself, truly a case of confusion at all, and therefore cannot support an infringement claim. In fact, in order for a plaintiff pleading initial interest confusion to prevail, that confusion must be more than momentary and more than a "mere possibility." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 n. 20 (2d Cir.1975). As with any alleged trademark violation, plaintiffs must show a genuine and "substantial" likelihood of confusion. *See Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir.1996) (requiring evidence of a substantial likelihood of confusion); *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201 (1st Cir.1983) (holding that evidence showing a few instances of temporary confusion was insufficient to support trademark infringe-

ment). The alleged confusion must be truly costly to the consumer.

■ This principle was implicit in the bricks-and-mortar cases that laid the groundwork for initial interest confusion as well as the Ninth Circuit's billboard analogy, which assumed that the deceived shopper, once diverted, would not get back on the highway. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir.1987) (competitor's logo confused oil traders into investing a considerable amount of time and effort into pre-sale negotiations with the defendant); *Grotrian*, 523 F.2d at 1341–42 (similar mark would entice even sophisticated consumers to consider defendant's pianos, even if any confusion was resolved prior to any purchase). Where, as here, a plaintiff has alleged a plausible likelihood of confusion based on the overall context in which a consumer performs his internet search, *see infra*, he has stated a claim for trademark infringement and may proceed on an initial interest theory.

### 3. Blue Nile's Sponsored Links

■ In assessing the likelihood of confusion, the first question for the Court is, which of the two scenarios above apply to Blue Nile's sponsored links: Were consumers misdirected by the search results, like a misleading billboard, or simply offered a menu of distinct, competing products? And second, if consumers were potentially misdirected by Blue Nile's sponsored links, was that potential for confusion sufficient to state a claim for trademark infringement?

■ Before proceeding, it is useful to review what conduct is presently before the Court. The sponsored link identified by Hearts on Fire in its Complaint resembles the billboard hypothetical above because it involved a direct display of the "Hearts on Fire" trademark. Compl. ¶ 21. Not even Blue Nile contests, at this stage

of the litigation, that this allegation states a claim for trademark infringement. Def. Mot. to Dismiss Mem. at 1 (document # 6). The question is whether Blue Nile's use of the trademark as a keyword trigger for sponsored links whose text did not contain the plaintiff's trademark is actionable. Compl. ¶ 23.

On the facts alleged in the Complaint, the Court finds that Hearts on Fire has stated a claim for trademark infringement, even where Blue Nile's sponsored links did not display the protected mark. In particular, the Plaintiff has offered sufficient allegations to support its claim that consumers were likely confused, and potentially misled, by Blue Nile's use of the trademark as a trigger for its sponsored links. While these advertisements may not have displayed the mark itself, the surrounding context supplies a sufficient basis to support allegations of consumer confusion at this early stage of the litigation.

Hearts on Fire is a diamond wholesaler, while Blue Nile is an internet diamond retailer; the two companies are not plain or obvious competitors. In fact, the Plaintiff sells its products online through authorized retailers who operate their own websites. A consumer who had just entered a search for Hearts on Fire diamonds might easily believe that the Defendant was one such authorized retailer when presented with Blue Nile's sponsored link, even if the accompanying text did not contain the trademarked phrase. This conclusion is perfectly commonsensical under the circumstances, even if search engines often return irrelevant results. Moreover, if the consumer clicked on the sponsored link thinking that he would find the sought-after diamonds at Blue Nile's website, Plaintiff alleges that on arrival nothing there would immediately alert him to his mistake. Whether this likely confusion was sufficiently sustained on all the

facts for Plaintiff to prevail on its infringement claim is a question for summary judgment. For now, the Plaintiff has alleged enough.

 Looking ahead, the First Circuit has identified eight criteria that a court should look to when determining whether a trademark use is likely to confuse an appreciable number of consumers: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between their channels of trade; (4) the relationship between their advertising; (5) the classes of their prospective purchasers; (6) any evidence of actual confusion of internet consumers; (7) the defendant's subjective intent in using the mark; and (8) the overall strength of the mark. *See Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 60–61 (1st Cir. 2008) (citing *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981)). Importantly, though "evidence of actual confusion is 'often deemed the best evidence of possible future confusion, proof of actual confusion is not essential to finding likelihood of confusion.'" *Venture Tape*, 540 F.3d at 61–62 (quoting *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 120 (1st Cir.2006)); *see also Brookfield Communications Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1050 (9th Cir.1999) ("[D]ifficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."). Indeed, the First Circuit has acknowledged the difficulty of obtaining such evidence in the internet context. *See Venture Tape*, 540 F.3d at 61–62. Thus, while proof of actual confusion is not required to show trademark infringement, the Plaintiff must still prove likely confusion based on inferences from the other seven factors.

 In addition to these familiar factors, under the circumstances here, the likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context. This content and context includes: (1) the overall mechanics of web-browsing and internet navigation, in which a consumer can easily reverse course; (2) the mechanics of the specific consumer search at issue; (3) the content of the search results webpage that was displayed, including the content of the sponsored link itself; (4) downstream content on the Defendant's linked website likely to compound any confusion; (5) the web-savvy and sophistication of the Plaintiff's potential customers; (6) the specific context of a consumer who has deliberately searched for trademarked diamonds only to find a sponsored link to a diamond retailer; and, in light of the foregoing factors, (7) the duration of any resulting confusion. This list is not exhaustive, but it identifies what the Court views as the most relevant elements to showing a likelihood of confusion in this case.

## IV. CONCLUSION

For the foregoing reasons, Blue Nile's Motion to Dismiss (document # 5) is **DENIED**.

**SO ORDERED.**