## Jenzabar, Inc. *vs.* Long Bow Group, Inc.

No. 11-P-1533.

Suffolk. May 3, 2012. - October 18, 2012.

Present: Berry, Milkey, & Sullivan, JJ.

*Trademark. Internet.*

In a civil action alleging, inter alia, trademark infringement arising from the defendant's unauthorized use of the plaintiff's trademark in a way that an Internet user conducting a search using a popular search engine would find the defendant's Web site prominently listed among the search results, the judge properly granted summary judgment in favor of the defendant, where, even if the defendant made a commercial use of the mark without the plaintiff's consent, the plaintiff failed to demonstrate that the use of the mark traded on that mark's good will in such a way as to create a likelihood of initial interest confusion, in that there was no similarity between the parties' goods, the plaintiff's actual and potential customers were sophisticated and were not likely to be confused, the strength of the mark was not a significant factor, there was no evidence that the defendant intended to confuse consumers through its use of the mark or that consumers actually were confused, and any uncertainty about the relationship of the defendant's site to the plaintiff did not create a material fact dispute. [654-665] Berry, J., dissenting.

In a civil action alleging, inter alia, trademark dilution arising from the defendant's unauthorized use of the plaintiff's trademark in a way that an Internet user conducting a search using a popular search engine would find the defendant's Web site prominently listed among the search results, the judge properly granted summary judgment in favor of the defendant, where the defendant's use of the plaintiff's mark did not dilute its distinctive quality, and the plaintiff suffered no injury to its business reputation. [665-666]

In a civil action, the judge properly granted summary judgment in favor of the defendant on a claim of unfair competition under G. L. c. 93A, where the plaintiff identified no specific way in which the defendant's otherwise lawful conduct fell within that statute's broad reach. [666-667]

This court remanded to the Superior Court for resolution in the first instance a request for attorney's fees. [667]

Civil action commenced in the Superior Court Department on May 14, 2007.

The case was heard by *John C. Cratsley*, J., on a motion for summary judgment.

*Joshua M. Dalton* (*Lawrence T. Stanley, Jr.*, with him) for the plaintiff.

*Paul Alan Levy*, of the District of Columbia, for the defendant.

*Douglas R. Wolf & Christina M. Licursi*, for Boston Patent Law Association, amicus curiae, submitted a brief.

*Christopher T. Bavitz*, for Digital Media Law Project, amicus curiae, submitted a brief.

MILKEY, J. Defendant Long Bow Group, Inc. (Long Bow), operates a Web site that contains information critical of plaintiff Jenzabar, Inc. (Jenzabar). During the relevant time period, an Internet user who conducted a search for the term "Jenzabar" using the Web site Google.com (Google) would have found Long Bow's site prominently listed among the search results. According to Jenzabar, that listing was likely to confuse Internet users into believing that the Long Bow site was sponsored by or affiliated with Jenzabar. Claiming that such confusion was caused by Long Bow's unauthorized use of the trademark "JENZABAR," Jenzabar sought to enjoin that use pursuant to State and Federal trademark law. A Superior Court judge granted Long Bow's motion for summary judgment. We affirm.[1]

*Standard of review.* We review a decision to grant summary judgment de novo, to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Bank of N.Y.* v. *Bailey*, 460 Mass. 327, 331 (2011), quoting from *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). "[T]hat some facts are in dispute will not necessarily defeat a motion for summary judgment. The point is that the disputed issue of fact must be material." *Hudson* v. *Commissioner of Correction*, 431 Mass. 1, 5 (2000), quoting from *Beatty* v. *NP Corp.*, 31 Mass. App. Ct. 606, 607 (1991). "A fact is 'material' only if it might provide a

---

[1]We acknowledge the helpful amicus briefs submitted by the Boston Patent Law Association in support of Jenzabar, and by the Digital Media Law Project in support of Long Bow.

basis for a fact finder to find in favor of the [nonmoving] party."
*Liss* v. *Studeny*, 450 Mass. 473, 482 (2008).[2]

*Background.* We summarize the essential facts, reserving
certain details for later discussion. Except where specifically
noted, the facts are undisputed.

1. *The parties.* Jenzabar is a Boston-based software company
that designs complex software systems for use by colleges and
universities. The company was founded in 1998 by Ling Chai,
who remains Jenzabar's president and chief operating officer.
Jenzabar holds a Federal registration in the word mark JENZA-
BAR for use in connection with the sale of computer software
and various related functions. Although the mark is not registered
in Massachusetts, there is no dispute either as to the validity and
protectability of the mark or as to Jenzabar's ownership of it.

Long Bow is a Massachusetts nonprofit corporation based in
Brookline. Long Bow produces educational films and documen-
taries about Chinese history and culture. Long Bow does not
sell its films directly to the public; instead, they are available
only through a network of independent distributors.

2. *Long Bow's Web site.* In 1995, Long Bow released "The
Gate of Heavenly Peace," a documentary about the Tiananmen
Square protests of 1989. A slightly abbreviated version of the
film was broadcast on public television stations in 1996. In con-
nection with that broadcast, Long Bow created a Web site to
give background information about the film and the protests.
The site, which has been updated periodically since its creation,
contains over 2,000 pages of text in English and Chinese, as
well as an interactive map of Tiananmen Square and a "media
library" that includes photographs, music, and video clips. It
has been recognized by a number of media organizations and
educational institutions as a valuable educational resource.[3]

Among the many resources on Long Bow's site is a section

---

[2]Because our review of the summary judgment record is de novo, the extent
to which the motion judge may have inappropriately engaged in fact finding is
ultimately beside the point.

[3]For example, the parties' statement of undisputed material facts notes that
as of November, 2009, Heidelberg University's Internet Guide for Chinese
Studies listed the site as an "essential" resource on the history of the People's
Republic of China.

containing information about sixteen of the "key characters" in the film. One of those characters is Chai, who was a student leader in the Tiananmen Square protests. The site contains a short biography of Chai, briefly describing her role in the protests and noting that she declined to be interviewed for the film. It also contains excerpts from Chai's criticism of the film and of her portrayal in it. After learning that Chai had founded a software company, Long Bow added a link from Chai's biography to a new page containing information about Jenzabar. That page, titled simply "Jenzabar," is the principal subject of the parties' present dispute.

3. *Google's search results.*[4] Since at least 2006, a Google user searching for "Jenzabar" would find Long Bow's "Jenzabar" page listed on the first page of results. A representative example of the initial search results, as they appeared prior to the summary judgment hearing, is reproduced in the Appendix. The listing for Long Bow's "Jenzabar" page specifically appeared as follows:

> "**Jenzabar**
>
> The information on these pages about Chai Ling and **Jenzabar**, the software company she runs with her husband, Robert Maginn, contains excerpts from and links . . .
>
> www.tsquare.tv/film/**jenzabar**.html - <u>Cached</u> - <u>Similar</u>"

As is generally true, Google created this listing by applying its proprietary algorithms to the computer code of Long Bow's "Jenzabar" Web page. The information that Long Bow supplied in its code included both the visible content of its page and data that a viewer of the page would not be able to see (known generically as "meta data" or "meta tags"). The relationship between the information that Long Bow provided and the content of Google's listing varied somewhat among the three main components of the listing: its title; its short description of the

---

[4]Although the record contains some information about results generated by other search engines, the parties have focused their discussion primarily upon Google, the most widely used Internet search engine. We do the same.

referenced Web page; and the "uniform resource locator" (URL) for that page.[5] The title of the referenced Web page ("Jenzabar") came from a "title tag" selected by Long Bow.[6] A Web site's creator can also insert a "description meta tag" to control the description that appears in a search listing. However, because Long Bow had not done so at the time suit was filed, the description that appeared in the listing for Long Bow's "Jenzabar" page was simply "ripped" by Google from the opening text that appeared on that page. The URL was chosen by Long Bow.

The order in which Google lists its search results is determined by its proprietary algorithms. Although the specifics of those algorithms are not publicly available, the summary judgment record indicates that Google relies in part on information that the page's creator provides (i.e., the content of the Web site) and information from other sources (e.g., the quantity and nature of other pages in Google's index that link to that page). Viewing the record in the light most favorable to Jenzabar, we treat as true Jenzabar's contention that a Web page's author can improve the page's ranking in Google search results through the use of "keywords meta tags."[7] Long Bow used the term "Jenzabar" as a "keywords meta tag" on its Jenzabar page and on several subsidiary pages linked to it.[8]

4. *Correspondence between the parties.* In February, 2007, Jenzabar contacted Long Bow with a number of complaints about Long Bow's "Jenzabar" page and two related pages. At that time, the pages contained excerpts from and links to media

---

[5]A URL is a unique character string that acts as a reference to an Internet resource. A Web page's URL typically begins with the string "http://" followed by a "domain name" (in this case, "www.tsquare.tv"). The domain name may be, but is not always, followed by a further string identifying a specific page.

[6]Although a title tag may not appear on a Web page, it is generally displayed at the top of a Web browser when a user visits that page.

[7]Jenzabar submitted an expert affidavit stating that keywords tags affect search rankings. Long Bow disputes this, citing official statements by Google. See, e.g., *Network Automation, Inc.* v. *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1146 n.3 (9th Cir. 2011), citing 4 McCarthy, Trademarks and Unfair Competition § 25:69 (4th ed. 2010) ("Modern search engines such as Google no longer use metatags").

[8]Long Bow's "Jenzabar" page is the only one of its pages ever to have been highly ranked in a Google search for "Jenzabar."

accounts of several lawsuits that had been filed against Jenzabar by some of its former top executives. Jenzabar complained that some of the quoted statements were false and demanded their removal. In addition, Jenzabar objected to Long Bow's uses of the JENZABAR mark in the URL and title of Long Bow's "Jenzabar" page and in all three pages' meta tags. According to Jenzabar, the use of its mark as a keyword was calculated to "maximize the prominence of [Long Bow's] Web pages on Internet search engines, in order to deliberately divert Internet users who are looking for the Jenzabar Web site." Jenzabar demanded that Long Bow remove the term "Jenzabar" from the title, URL, and meta tags of its Web pages.

Long Bow made several changes to its site as a result of Jenzabar's letter. These changes included posting certain additional information regarding Jenzabar's disputes with its former executives; revising the language of the pages to ensure that readers would be aware that Jenzabar disputed the accuracy of some of the accounts; and adding prominent disclaimers to all of the pages on which Jenzabar was mentioned stating that the pages were "the sole responsibility of the Long Bow Group, and are in no way affiliated with or sponsored by Jenzabar, Inc."

5. *The lawsuit.* Unsatisfied with Long Bow's response, the plaintiffs filed an eight-count complaint in Superior Court on May 14, 2007. The first two counts alleged defamation and trade libel. The remaining counts alleged trademark infringement, trademark dilution, and unfair competition, under both Massachusetts and Federal law. See 15 U.S.C. §§ 1114, 1125(a) & (c) (2006); G. L. c. 110H, §§ 12, 13, 16; G. L. c. 93A, § 11.

Long Bow moved to dismiss the complaint for failure to state a claim. See Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974). On August 20, 2008, a judge allowed Long Bow's motion as to the two defamation counts,[9] and the plaintiffs have raised no issue on appeal regarding that dismissal. On the trademark counts,

---

[9]The judge noted that the plaintiffs conceded the truth of most of the statements published on Long Bow's site. As to the only statement on the site alleged to be false (an excerpt from a Boston Globe article), the judge found that the statement was indisputably accurate when Long Bow published it. Without reaching the question of the actual truth or falsity of the statement at

the judge held that although Jenzabar seemed unlikely to prevail, it had adequately pleaded the claims to survive a motion to dismiss. Following extensive discovery, Long Bow moved for summary judgment. See Mass.R.Civ.P. 56(b), 365 Mass. 824 (1974). After a hearing, a second judge concluded that the evidence was insufficient to allow a jury to find that Long Bow's use of the JENZABAR mark created any likelihood of confusion.[10] He granted Long Bow's motion in full on December 7, 2010.

*Discussion.* 1. *Trademark infringement.* To prevail on a claim of trademark infringement under the Lanham Act, a plaintiff must show (1) that the plaintiff owns a valid and protectable mark; (2) that the defendant made a commercial use of that mark without the plaintiff's consent; and (3) that the defendant's use of the mark is likely to create confusion, thus causing harm to the plaintiff.[11] 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A) (2006). There is no dispute in this case as to the first element, so we begin by examining Long Bow's use of the mark.

a. *Commercial use.* To be liable under the Lanham Act, a defendant must use a mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a). See 15 U.S.C. § 1125(a)(1). Because its Web site's purpose is educational rather than commercial, Long Bow argues with some force that its use of the JENZABAR mark was not "in connection with any goods or services," and that it thus cannot be liable for trademark infringement. See, e.g., *Bosley Med. Inst.* v. *Kremer*, 403 F.3d 672, 678 (9th

---

the time of suit, the judge held that as a matter of law, Long Bow had no continuing duty to investigate the article's accuracy in the years following its publication.

[10]Prior to the hearing, Jenzabar moved to amend its complaint. Although he never formally acted on the motion to amend, the judge treated the complaint as amended. We do the same.

[11]The gravamen of a claim of trademark infringement under Massachusetts common law is the same as under the Lanham Act: likelihood of confusion. See generally *Planned Parenthood Fedn. of America, Inc.* v. *Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 484-486 (1986); *Castricone* v. *Mical*, 74 Mass. App. Ct. 591, 594-595 (2009). To the extent that Jenzabar has attempted to state a claim under Massachusetts' statutory infringement provision, G. L. c. 110H, § 12, such a claim fails because the JENZABAR mark is not registered in Massachusetts.

Cir. 2005); *Utah Lighthouse Ministry* v. *Foundation for Apologetic Information & Research*, 527 F.3d 1045, 1052-1053 (10th Cir. 2008). According to Jenzabar, however, the fact that a page on the Long Bow site contains contact information for the distributors of Long Bow's films is sufficient to render any use on the site a use "in connection with the sale" of those films. This position finds some support in the Federal case law. See, e.g., *Taubman Co.* v. *Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003). We need not resolve this issue, because our decision rests on other grounds.

b. *Likelihood of confusion.* The core element of trademark infringement is the likelihood of confusion, i.e., whether the defendant's use of the plaintiff's mark is likely to confuse consumers about the "source, sponsorship or affiliation" of the defendant's goods or services. *Pignons S.A. de Mecanique de Precision* v. *Polaroid Corp.*, 657 F.2d 482, 492 (1st Cir. 1981). Although likelihood of confusion is ordinarily a question of fact for the jury, it may be resolved on summary judgment if the plaintiff has failed to present evidence sufficient to permit a reasonable jury to conclude that consumers are likely to be confused. See *id.* at 486; *International Assn. of Machinists & Aerospace Workers, AFL-CIO* v. *Winship Green Nursing Center*, 103 F.3d 196, 199-200 (1st Cir. 1996). See generally 6 McCarthy on Trademarks and Unfair Competition § 32:120 (4th ed. 2010) (McCarthy on Trademarks). In an appeal from a grant of summary judgment in favor of a trademark defendant, it is our job as "the reviewing court [to] decide whether the evidence as a whole, taken most hospitably to the markholder, generates a triable issue as to likelihood of confusion." *International Assn. of Machinists & Aerospace Wkrs.*, *supra* at 201. The trademark plaintiff must show "a probability of confusion; it is not sufficient if confusion is merely possible." *Nora Bevs., Inc.* v. *Perrier Group of America, Inc.*, 269 F.3d 114, 121 (2d Cir. 2001), quoting from *Estee Lauder Inc.* v. *The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997).[12] Jenzabar thus "must demon-

---

[12]This standard "does not change on summary judgment . . . . The fact that on summary judgment the evidence must be construed in a light favorable to the non-moving party does not modify the standard itself, which requires a showing of a probability, or likelihood, of confusion." *Nora Bevs., Inc.*, *supra*.

strate a substantial likelihood of confusion to survive summary judgment." *Beacon Mut. Ins. Co.* v. *OneBeacon Ins. Group*, 376 F.3d 8, 14 (1st Cir. 2004).

Jenzabar's claim of potential consumer confusion is an exceptionally narrow one. There is no allegation that someone might buy one of Long Bow's films under the mistaken impression that it was produced by or in affiliation with Jenzabar. Nor does Jenzabar allege that a visitor to any page on Long Bow's Web site would be confused about whether Jenzabar had created or endorsed the site (a proposition that would have been untenable even before Long Bow added prominent disclaimers to its site). Instead, Jenzabar claims only that an Internet user viewing the results of a Google search for the term "Jenzabar" might click the result for Long Bow's "Jenzabar" page under the mistaken belief that the linked page is officially sponsored by Jenzabar. According to Jenzabar, this momentary confusion, dispelled the moment the Internet user reaches Long Bow's site, is actionable under the principle of "initial interest confusion."

c. *Initial interest confusion.* "Initial interest confusion occurs when the defendant uses the plaintiff's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion." *Nissan Motor Co.* v. *Nissan Computer Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005), quoting from *Interstellar Starship Servs., Ltd.* v. *Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002). Several Federal courts of appeals, including the First Circuit, have characterized initial interest confusion as a type of "bait and switch" tactic whereby the infringer impermissibly trades on the good will of the plaintiff's mark. *Beacon Mut. Ins. Co.*, 376 F.3d at 16 n.4, quoting from *Dorr-Oliver, Inc.* v. *Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996). See *Checkpoint Sys., Inc.* v. *Check Point Software Technologies, Inc.*, 269 F.3d 270, 294 (3d Cir. 2001); *Lamparello* v. *Falwell*, 420 F.3d 309, 317 (4th Cir. 2005), cert. denied, 547 U.S. 1069 (2006); *Vail Assocs., Inc.* v. *Vend-Tel-Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008); 4 McCarthy on Trademarks § 23:6 (2011). The essence of a claim of initial interest confusion is thus that the defendant has "acted in a way which traded on the goodwill of [the plaintiff's] trademark."

*Interstellar Starship Servs.*, 304 F.3d at 944. Absent such misappropriation of good will, an "erroneous guess" on the part of a consumer about the source of a Web site "does not generally amount to a likelihood of initial interest confusion." *Id.* at 945.

In determining whether a defendant is engaging in the type of "bait and switch" behavior that gives rise to actionable initial interest confusion, courts have generally focused on five factors. Those factors are (1) the relatedness of the parties' goods or services; (2) the level of care exercised by the relevant consumers; (3) the strength of the plaintiff's mark; (4) the defendant's intent in using the plaintiff's mark; and (5) evidence of actual consumer confusion. See, e.g., *Network Automation, Inc.* v. *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1154 (9th Cir. 2011). In cases that involve Internet search results, courts have also examined the visual appearance of the particular link or advertisement in context on the screen. *Ibid.* See also *Hearts on Fire Co.* v. *Blue Nile, Inc.*, 603 F. Supp. 2d 274, 289 (D. Mass. 2009). We believe that these six factors are the salient considerations in the specific factual circumstances of this case.

No single factor in the analysis is dispositive. However, in determining whether the defendant has appropriated the good will of the plaintiff's mark in such a way as to cause actionable initial interest confusion, courts have focused especially on the first two factors. *Interstellar Starship Servs.*, 304 F.3d at 945 ("actionable initial interest confusion on the Internet is determined, in large part, by the relatedness of the goods offered and the level of care exercised by the consumer"). See also *Checkpoint Sys., Inc.*, 269 F.3d at 296-297; *Promatek Indus., Ltd.* v. *Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002); *Sensient Technologies Corp.* v. *SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010), cert. denied, 131 S. Ct. 1603 (2011). These factors are paramount because "[w]hen products are similar, a firm is more likely to benefit from the goodwill of a firm with an established mark. And when consumers do not exercise a high level of care in making their decisions, it is more likely that their initial confusion will result in a benefit to the alleged infringer from the use of the goodwill of the other firm." *Checkpoint Sys. Inc.*, *supra* at 296-297. Accord *Interstellar Starship Servs.*, *supra* at 945. "Conversely, in the absence

of these factors, some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement. Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence" in the analysis of whether any actionable initial interest confusion is likely. *Checkpoint Sys., supra* at 297. See *Nissan Motor Co.*, 378 F.3d at 1019 (holding in context of summary judgment motion that defendant's use of NISSAN mark was actionable only to extent that defendant "traded on the goodwill of Nissan Motor by offering links to automobile-related websites").

(i) *Relatedness of the parties' goods*. In this case, there is no similarity between the parties' goods. Jenzabar sells complex software systems; Long Bow sells documentaries about China. Jenzabar has never sold documentary films, and Long Bow has never sold computer software of any kind. The most that Jenzabar can say on this factor is that both parties sometimes sell their goods to institutions of higher education. "The most favorable inference that may be drawn from [this] evidence . . . is that both parties' products are used in the [education] field. However, such a broad inference is not sufficient to demonstrate that a genuine issue exists" on this factor. *Astra Pharmaceutical Prod., Inc.* v. *Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983) (affirming summary judgment in favor of trademark defendant). Because the parties' goods are unrelated,[13] this factor strongly suggests that no actionable confusion is likely as a matter of law. Cf. *Hasbro, Inc.* v. *Clue Computing, Inc.*, 232 F.3d 1, 2 (1st Cir. 2000) (in affirming summary judg-

---

[13]Jenzabar has attempted to create a factual dispute about the similarity of the parties' goods by claiming in an affidavit that it may expand its business activities "to include the creation and production of educational content," possibly including films. However, Jenzabar has offered no concrete evidence to substantiate this allegation. "An adverse party may not manufacture disputes by conclusory factual assertions; such attempts to establish issues of fact are not sufficient to defeat summary judgment." *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 648 (2002). Moreover, prior to submitting the affidavit Jenzabar conceded in a deposition that it has "no business interest that overlaps with" Long Bow, which presumably would include sale of related goods. "[T]he nonmoving party cannot create a material issue of fact and defeat summary judgment simply by submitting affidavits that contradict its previously sworn statements." *Ibid.*

ment in favor of trademark defendant, endorsing District Court's "refusal to enter the 'initial interest confusion' thicket . . . given the unlikelihood of 'legally significant' confusion" in a case "involving such disparate products and services").[14]

(ii) *Sophistication of consumers.* "If likelihood of confusion exists, it must be based on the confusion of some relevant person; i.e., a customer or purchaser." *Astra Pharmaceutical*, 718 F.2d at 1206. It is not sufficient for Jenzabar to suggest that a careless Web user might be confused by Long Bow's search result. To defeat summary judgment, Jenzabar must instead produce evidence from which a jury could conclude that Jenzabar's actual or potential customers were substantially likely to be confused. The undisputed sophistication of those customers, and the degree of care they exercise in selecting their software, strongly indicates that no actionable confusion is likely as a matter of law. According to Jenzabar, "the purchase of [Jenzabar's] software is expensive and includes a multi-year maintenance and service contract between the institution and the vendor." For this reason, "customers typically engage in extensive due diligence over a period of months or years prior to making a decision to purchase or upgrade a Jenzabar system, or to switch from a Jenzabar system to a competitor's system." "There is always less likelihood of confusion where goods are expensive and purchased after careful consideration." *Peoples Fed. Sav. Bank* v. *People's United Bank*, 672 F.3d 1, 15 (1st Cir. 2012), quoting from *Astra Pharmaceutical*, 718 F.2d at 1206. "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint Sys., Inc.,* 269 F.3d at 284. See *Sensient Technologies Corp.,* 613 F.3d at 766 (on defendant's motion for summary judgment, concluding that no initial interest confusion was shown between similar products where customers were sophisticated and exercised high degree of care).

---

[14]Compare *Lamparello*, 420 F.3d at 317-318 (suggesting that initial interest confusion can apply in Internet context only where defendant profits financially from use of plaintiff's mark). We do not rely on that ground.

(iii) *Strength of Jenzabar's mark.* "The stronger a mark — meaning the more likely it is to be remembered and associated in the public mind with the mark's owner — the greater the protection it is accorded by the trademark laws." *Network Automation, Inc.*, 638 F.3d at 1149, quoting from *Brookfield Communications, Inc.* v. *West Coast Entertainment Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999). This factor is relevant to the likelihood of initial interest confusion in an Internet search because "a consumer searching for a distinctive term is more likely to be looking for a particular [entity], and therefore could be more susceptible to confusion" if a link to a different entity's Web site appears in the search. *Network Automation, Inc., supra.*

In the context of a motion for summary judgment we accept Jenzabar's contentions that JENZABAR is a fanciful term invented for use as the company's name and that the mark has developed a strong reputation in the higher education community. This factor thus favors Jenzabar.[15] However, this factor must be viewed in light of the two factors we have already examined. See *id.* at 1149-1150. In particular, this factor's significance is diminished by the fact that Long Bow's site actually does contain information about Jenzabar rather than, for example, linking to a competing or similar product. Compare, e.g., *Promatek Indus. Ltd.*, 300 F.3d at 812-813 (finding likelihood of confusion where defendant used direct market competitor's mark in meta tags). An Internet user who performs a search even for an extremely strong trademark may be searching for information *about* the mark's holder rather than for the mark holder's official Web site. A search result leading to a third-party Web site that contains such information thus may not be confusing at all.

(iv) *Long Bow's intent.* In examining the likelihood of initial interest confusion, as in other contexts, "[a] defendant's intent to confuse constitutes probative evidence of likely confusion:

---

[15]The fact that one factor favors Jenzabar is not fatal to Long Bow's motion. "It would be illogical for a merely disputed factor to preclude summary judgment . . . [T]he nonmoving party's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue. A finding that at least one factor favors the nonmoving party is likely, but such finding does not prevent an overall finding of no likelihood of confusion or preclude summary judgment." *Gray* v. *Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002) (citation omitted).

Courts assume that the defendant's intentions were carried out successfully" (footnote omitted). *Playboy Enterprises, Inc.* v. *Netscape Communications Corp.*, 354 F.3d 1020, 1029 (9th Cir. 2004). See *WCVB-TV* v. *Boston Athletic Assn.*, 926 F.2d 42, 45 (1st Cir. 1991). Cf. *Planned Parenthood of America, Inc.* v. *Problem Pregnancy of Worcester*, 398 Mass. 480, 488 (1986).

Jenzabar has produced no direct evidence that Long Bow intended to confuse consumers through its use of the mark. Instead, Jenzabar points to the fact that "Long Bow has deliberately used the JENZABAR mark in the title tag, website description, metatags, and other metadata." This certainly is evidence of Long Bow's intent to *use* Jenzabar's mark, and for summary judgment purposes we assume that Long Bow's use of the mark in its meta tags was for the purpose of improving its site's ranking in a Google search for "Jenzabar." See note 7, *supra*. However, "the only relevant intent is intent to confuse." *Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009), quoting from 4 McCarthy on Trademarks § 23:113 (2011). Given that Long Bow's site actually contains information about Jenzabar and does not sell goods that compete with Jenzabar, the most natural inference arising from Long Bow's use of the word "Jenzabar" is not of intent to confuse but rather of intent to accurately describe the page's contents and to bring it to the attention of Internet users searching for information about Jenzabar, who would find it relevant to their search.

We also note that much of the undisputed evidence suggests that Long Bow is not attempting to confuse Internet users. Long Bow makes use only of the word "Jenzabar" (necessary to describe the site's contents), without imitating any stylistic elements of Jenzabar's logo or Web site in a way that might tend to mislead Internet users. "Jenzabar" is included as a keyword for pages that contain information about Jenzabar, but not for any of the other pages in Long Bow's site. When Jenzabar contacted Long Bow with complaints about the site, Long Bow responded promptly and conscientiously, posting Jenzabar's objections on the Long Bow site so that visitors could judge for themselves and adding prominent disclaimers of any affiliation with Jenzabar to every page on which the company was

mentioned. After Jenzabar filed an amended complaint identifying the description that appeared in the Long Bow site's Google listing as potentially problematic, Long Bow took additional steps to clarify the site's relationship to Jenzabar in terms that are impossible to misread.[16] Most significantly, it is undisputed that Long Bow had no knowledge of where its pages ranked in the results of a Google search for "Jenzabar" until Jenzabar contacted Long Bow in 2006. Although matters of intent generally involve credibility determinations for juries to resolve, "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Nora Bevs., Inc.*, 269 F.3d at 125, quoting from *Resource Developers, Inc.* v. *Statue of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 141 (2d Cir. 1991) (affirming summary judgment in favor of trademark defendant). Given the over-all factual context of this case, Jenzabar has not produced legally sufficient evidence of Long Bow's intent to create a genuine dispute on this factor.

(v) *Evidence of actual confusion.* For obvious reasons, evidence of actual consumer confusion is always relevant to the question whether consumers are likely to be confused. See *Venture Tape Corp.* v. *McGills Glass Warehouse*, 540 F.3d 56, 61 (1st Cir. 2008), cert. denied, 556 U.S. 1128 (2009). Jenzabar has produced no evidence of actual confusion. The fact that a number of visitors reached Long Bow's site via a Google search for "Jenzabar" is not evidence that those visitors were confused. Jenzabar has submitted no evidence, either through consumer surveys or even merely anecdotal, showing that those visitors were searching for the Jenzabar Web site and were confused by the Long Bow site's search listing. "[I]t is improper to assume that using a trademarked keyword means that the searcher wanted to find the trademark owner. . . . Finding searcher 'diversion' is not possible until one knows where searchers were heading in the first place." 4 McCarthy on Trademarks § 23:6, at 23-55 n.13 (2011), quoting from Goldman, Deregulating Relevancy in

---

[16]Specifically, Long Bow added a meta tag so that the description of its page appearing in Google search results now reads, "Jenzabar has tried to censor this web page because it carries critical information about the software company that Chai Ling started with her husband."

Internet Trademark Law, 54 Emory L.J. 507, 566 (2005). This is especially true because, as Jenzabar concedes, the types of consumers most likely to be running a Google search for Jenzabar would be inclined to do "extensive due diligence" on the company. This factor cannot aid Jenzabar in averting summary judgment.

(vi) *Appearance of the search results.* Finally, we turn to an objective examination of how the results of a Google search for "Jenzabar" actually appeared on an Internet user's screen at the time of suit.[17] We first note that the top result in such a search has at all times been Jenzabar's official corporate home page. An Internet user searching for that page would therefore find it exactly where she expected to — at the top of the search results for "Jenzabar." Such a searcher could click the top link and complete her search unconfused and unimpeded by any act of Long Bow's. There would be no reason to continue down the list of search results unless she was looking for further information about Jenzabar, in which case the Long Bow site would be relevant and helpful rather than confusing.[18]

Moreover, the Long Bow site's listing did little affirmatively to suggest official endorsement by Jenzabar. The description was an accurate summary of the page's contents, and was phrased in a neutral manner that did not suggest official sponsorship by Jenzabar. The URL, prominently displayed in the search engine listing, was visibly different from the official Jenzabar URLs that appeared all around it; all of the official sites contained the JENZABAR mark in their domain names, while Long Bow's

[17]As noted above, see note 16, *supra,* Long Bow added a description tag to the Web page in question after the suit was filed. At oral argument Jenzabar agreed that the search result is not confusing as it currently stands. This "voluntary reform" by Long Bow does not render Jenzabar's action for injunctive relief moot. *American Bd. of Psychiatry & Neurology* v. *Johnson-Powell,* 129 F.3d 1, 5 (1st Cir. 1997).

[18]We do not mean to suggest that search engine optimization using another company's trademarks cannot suggest a likelihood of confusion as long as the defendant's site is not the top result in a search. Where the parties are market competitors, for example, *any* use of a plaintiff's mark for this purpose might be actionable. See, e.g., *Promatek Indus. Ltd.,* 300 F.3d at 812-813. We merely note that were the defendant's site the top result in a Google search for the plaintiff's mark, that might be suggestive of a likelihood of confusion even in a case such as this one, where the balance of factors otherwise tilts so strongly against such a finding.

domain name is "tsquare.tv" — a name that does not suggest affiliation with Jenzabar. The only aspect of the listing that was even potentially confusing was its single-word title: "Jenzabar." Although Jenzabar may be correct that it is unusual for a Web page's title to be the unadorned trade name of an entity unaffiliated with the page, the title does little affirmatively to suggest official sponsorship by or affiliation with Jenzabar.[19] Internet users, especially those who influence buying decisions regarding expensive software for large educational institutions (the class of consumers whose confusion would be relevant), understand that a Google search returns a list of pages of varying relevance from a wide range of sources. "They fully expect to find some sites that aren't what they imagine based on a glance at the . . . search engine summary," and they "don't form any firm expectations about the sponsorship of a website until they've seen the landing page — if then." *Network Automation, Inc.*, *supra* at 1152-1153, quoting from *Toyota Motor Sales* v. *Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010). To be sure, an Internet user searching for Jenzabar's products who came across the listing for Long Bow's Web site (after already having found Jenzabar's official site) perhaps might be uncertain about this additional site's relationship to Jenzabar. However, Jenzabar has not shown how Long Bow would capitalize on any such uncertainty in a way that trades on Jenzabar's good will. See *Interstellar Starship Servs.*, 304 F.3d at 946 (finding no likelihood of confusion where the defendant "could not financially capitalize on [a] misdirected consumer even if it so desired").[20] Under the circumstances of this case, such potential uncertainty

---

[19]At oral argument, Jenzabar suggested that a ruling in Long Bow's favor would necessarily endorse the use of titles such as "Jenzabar — Official." Such titles not only would actively suggest official sponsorship, but also would strongly suggest an intent on their creators' part to deceive Internet users.

[20]Compare *Lamparello*, 420 F.3d at 317, quoting from Travis, The Battle for Mindshare: The Emerging Consensus that the First Amendment Protects Corporate Criticism and Parody on the Internet, 10 Va. J.L. & Tech. 3, 85 (2005) ("The premise of the 'initial interest' confusion cases is that by using the plaintiff's trademark to divert its customers, the defendant is engaging in the old 'bait and switch.' But because . . . Internet users who find [gripe sites] are not sold anything, the mark may be the 'bait,' but there is simply no 'switch' ").

would be a result of "sensible agnosticism, not consumer confusion." *Toyota Motor Sales, supra.* Where the balance of factors otherwise so strongly favors Long Bow, we decline to hold that such uncertainty creates a material factual dispute on the likelihood of actionable initial interest confusion.[21]

d. *Summary.* To avert summary judgment, Jenzabar bore the burden of "adducing significantly probative evidence tending to show that an appreciable number of [relevant consumers] were in fact likely to be confused or misled." *International Assn. of Machinists & Aerospace Workers, AFL-CIO,* 103 F.3d at 201. Upon examining the relevant factors, we agree with the motion judge that Jenzabar "has not reached this plateau." *Ibid.* Based on the undisputed facts presented here, no rational trier of fact could find that Long Bow's use of the JENZABAR mark trades on that mark's good will in such a way as to create a likelihood of initial interest confusion actionable under the trademark laws.[22]

2. *Trademark dilution.* Under G. L. c. 110H, § 13, inserted by St. 2006, c. 195, § 2,[23] injunctive relief is available to a plaintiff who can show a "[l]ikelihood of injury to business

---

[21]Of course, any remaining uncertainty whether the Long Bow Jenzabar page was endorsed by Jenzabar would be resolved with one click of the mouse. However, we do not find this determinative, because — as the case law on initial interest confusion suggests — the duration of any confusion may be immaterial if it results in the defendant improperly capitalizing on the good will of the mark's owner. *Promatek Indus. Ltd.,* 300 F.3d at 812-813 ("What is important is not the duration of the confusion, it is the misappropriation of Promatek's goodwill").

[22]While we do not quarrel with the general proposition that a use of a trademark need not be directly competitive with the mark's owner in order to be infringing, see the dissent, *post* at 667, 672, some commercially relevant misappropriation of the trademark owner's good will is necessary for the Lanham Act to be implicated. "A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will." *Sugar Busters LLC* v. *Brennan,* 177 F.3d 258, 265 (5th Cir. 1999), quoting from *Prestonettes, Inc.* v. *Coty,* 264 U.S. 359, 368 (1924). Concluding, as we do, that no such misappropriation of good will has occurred, we need not consider Long Bow's alternative arguments that its conduct constitutes a "nominative fair use" or is otherwise protected by the First Amendment to the United States Constitution.

[23]The original complaint also contained a Federal dilution claim, which would have required proof that the JENZABAR mark is "famous," as defined in the Federal Trademark Dilution Revision Act of 2006. See 15 U.S.C. § 1125(c)(2)(A) (2006). Jenzabar dropped that claim prior to the summary judgment hearing.

reputation or of dilution of the distinctive quality of . . . a mark valid at common law." Long Bow's use of the JENZABAR mark does not dilute that mark's "distinctive quality," i.e., its link in the minds of consumers only to its owner. Instead, Long Bow's use actually tends to reinforce that quality, since Long Bow uses the mark only to refer to Jenzabar itself. As for "injury to business reputation," the only possible injury of that nature stems from the critical content of Long Bow's site. This is not a trademark harm. "Trademark injury arises from an improper association between the mark and products or services marketed by others." *Universal Communication Sys., Inc.* v. *Lycos, Inc.*, 478 F.3d 413, 423 (1st Cir. 2007). "If the injury alleged is one of critical commentary, it falls outside trademark law, whether the criticism is warranted or unwarranted." *Id.* at 424. See 6 McCarthy on Trademarks § 31:148. Summary judgment was proper on Jenzabar's dilution claim.

3. *Chapter 93A.* General Laws c. 93A, § 2, inserted by St. 1967, c. 813, § 1, makes unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Jenzabar maintains that summary judgment on its c. 93A claim was improper because c. 93A's reach is potentially broader than that of the trademark laws. However, even assuming that to be the case,[24] Jenzabar has identified no specific way in which the added breadth of c. 93A brings Long Bow's otherwise lawful conduct within that statute's reach. We have already concluded that Long Bow's conduct does not possess "a tendency to deceive." *Aspinall* v. *Philip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004), quoting from *Leardi* v. *Brown*, 394 Mass. 151, 156 (1985). When a Web site contains truthful commentary about a company and does not sell products that compete with the company, attempting to bring the site to the attention of Internet users searching for information about that company does not violate "any recognized or established common law or statutory concept of unfairness." *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 624 (1994). No claim remains that the content of Long Bow's

---

[24]But see *Castricone* v. *Mical*, 74 Mass. App. Ct. 591, 601 n.12 (2009) (in the trademark context, "[t]he common-law wrongdoing permits, but does not compel, a finding of c. 93A misconduct").

Web site is false or misleading. Under the circumstances of this case, we agree with the motion judge that Jenzabar's c. 93A claim cannot stand in the absence of its defamation and trademark claims.

4. *Attorney's fees.* After judgment entered on the trademark claims, Long Bow moved for attorney's fees pursuant to Mass. R.Civ.P. 7(b), 365 Mass. 749 (1974); Rule 9A of the Superior Court (2009); and § 35(a) of the Lanham Act, 15 U.S.C. § 1117(a) (2006). Aware that Jenzabar was pursuing an appeal, the judge found that the motion was "premature on the ground of judicial economy." For that reason, the judge "decline[d] to act on [the] motion at [that] time," and denied it without prejudice. Although Long Bow filed a cross appeal challenging that ruling, both parties agree that the question of attorney's fees now needs to be addressed and that the Superior Court is the appropriate forum to do so. Without specifically endorsing the approach taken by the motion judge, we remand the question of attorney's fees for a Superior Court judge to resolve in the first instance.

*Conclusion.* The order granting Long Bow's motion for summary judgment is affirmed. The order on Long Bow's motion for attorney's fees is vacated, and the matter is remanded to the Superior Court.

*So ordered.*

BERRY, J. (dissenting). I respectfully dissent. The Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1)(A) (2006), prohibits Long Bow Group, Inc. (Long Bow), from using the trademark of Jenzabar, Inc. (Jenzabar), in a way that is likely to confuse Internet users to believe that the Long Bow Web site is somehow connected to, or affiliated with, Jenzabar — which it is not. This confusion, suggesting a nonexisting affiliation with Jenzabar, is crafted through a "negative" omission of an identifying Long Bow title and a "positive" singular reference to the trade name Jenzabar. The trade name Jenzabar is thus embedded within an Internet link, which actually belongs to Long Bow, *not* Jenzabar. The confusing and misleading link diverts the Internet user to the secondary Long Bow site by trading on the Jenzabar name.

Further, the record demonstrates that Long Bow deliberately used Jenzabar's trademark in its search listing and Web site hypertext markup language (HTML) code in order to create "initial interest confusion" that trades wrongly on Jenzabar's mark. Perhaps the "best evidence" of initial interest confusion, which is violative of the Lanham Act, is seen in the page produced by a search of the Web site Google.com (Google) using the trademark Jenzabar. That best evidence of the Google search page is attached as an Appendix.

I read the majority to acknowledge that initial interest confusion may support liability under the Lanham Act. "Most courts now recognize the initial interest confusion theory as a form of likelihood of confusion which can trigger a finding of infringement." 4 McCarthy, Trademarks and Unfair Competition § 23:6 (4th ed. 2011) (McCarthy on Trademarks), which cites the following supporting case law: *Mobil Oil Corp.* v. *Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987); *Checkpoint Sys., Inc.* v. *Check Point Software Technologies, Inc.*, 269 F.3d 270 (3d Cir. 2001); *Pebble Beach Co.* v. *Tour 18 I, Ltd.*, 942 F. Supp. 1513 (S.D. Tex. 1996), judgment aff'd as modified, 155 F.3d 526 (5th Cir. 1998); *McNeil-PPC, Inc.* v. *Guardian Drug Co., Inc.*, 984 F. Supp. 1066 (E.D. Mich. 1997); *Sensient Technologies Corp.* v. *SensoryEffects Flavor Co.*, 613 F.3d 754 (8th Cir. 2010), cert. denied, 131 S. Ct. 1603 (2011); *Syndicate Sales, Inc.* v. *Hampshire Paper Corp.*, 192 F.3d 633 (7th Cir. 1999); *Dr. Seuss Enterprises, L.P.* v. *Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir.), cert. dismissed, 521 U.S. 1146 (1997); *Australian Gold, Inc.* v. *Hatfield*, 436 F.3d 1228 (10th Cir. 2006); *HRL Assocs., Inc.* v. *Weiss Assocs., Inc.*, 12 U.S.P.Q.2d 1819 (Trademark Trial & App. Bd. 1989), aff'd on other grounds, 902 F.2d 1546 (Fed. Cir. 1990).[1]

The Federal courts usually consider several factors in cases of initial interest confusion. These include (1) the relatedness

---

[1]While the above cited series of Federal cases support the concept of initial interest confusion as a Lanham Act violation, the United States Court of Appeals for the First Circuit has not addressed initial interest confusion. See *EMC Corp.* v. *Hewlett-Packard Co.*, 59 F. Supp. 2d 147, 150 (D. Mass. 1999); *Hearts on Fire Co., LLC* v. *Blue Nile, Inc.*, 603 F. Supp. 2d 274, 280 n.4 (D. Mass. 2009) (both cases concluding that the First Circuit had not taken a position on initial interest confusion).

of the parties' goods or services; (2) the level of care exercised by the relevant customers; (3) the strength of the plaintiff's mark; (4) the defendant's intent in using the plaintiff's mark; (5) the evidence of actual consumer confusion, *Network Automation, Inc.* v. *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1154 (9th Cir. 2011); and (6) the visual appearance of the link or advertisement in context of the screen, *Hearts on Fire Co.* v. *Blue Nile, Inc.*, 603 F. Supp. 2d 274, 289 (D. Mass. 2009).

In my opinion, three of the afore-described factors are present in this Jenzabar case such that the grant of summary judgment was error of law. These three present factors relate to (1) the strength of Jenzabar's trademark; (2) the confusing appearance of the Internet listing line for Long Bow, which omits the Long Bow name and references only the Jenzabar trademark; and (3) Long Bow's intent to confuse. I address each in turn.

1. *The strength and reputation of the Jenzabar trademark.* The majority acknowledges that the Jenzabar company has developed a strong reputation in the higher education community over several years, and that the company has always been uniquely tied to its trademark. The "Jenzabar" trademark does not refer to anything other than the Jenzabar company. The mark is likely to be associated only with the Jenzabar company, and is therefore accorded greater protection by trademark law. See *Network Automation, Inc.* v. *Advanced Sys. Concepts, Inc.*, 638 F.3d at 1154.

2. *The confusingly similar appearance of the Internet search listing line crafted by Long Bow.* The likelihood of confusion in search engine cases "will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." *Hearts on Fire Co.* v. *Blue Nile, Inc.*, 603 F. Supp. 2d at 289. Google search result listings generally comprise three elements: a title, a short page description, and a Web address. (See the Appendix, which, as previously noted, sets forth a Google search for Jenzabar that leads the searcher to the Long Bow site, notwithstanding that the name Long Bow is hidden.) Again to be emphasized is that the search listing devised by Long Bow, and at issue here, bears only the trademark "Jenzabar" — that is, the listing bears only the unique and unadorned trade name of the Jenzabar company. The predominant term in this search

listing is *not* Long Bow — indeed the title Long Bow does *not* appear anywhere in the search listing that takes the viewer to the Long Bow site address. *Instead, the dominant term in the search listing devised by Long Bow is "Jenzabar."* The design of this search listing yields precisely the likelihood of initial interest confusion prohibited by the Lanham Act. The challenged description and Web address, which appear below the trademark Jenzabar, fail to mention Long Bow or clarify ownership of the page in any way. The challenged Internet listing of Long Bow trades on the name Jenzabar and, thereby, achieves immediate placement behind the trademark for Jenzabar and the Jenzabar primary Internet pages.

It may be that a sophisticated Internet user — even though the name Long Bow is hidden — may be able to differentiate the challenged search listing from the Jenzabar search listings appearing above and below. And it may be that the Long Bow page is not quite so confusing once an Internet user arrives there. But that second step-away does not dispel the first step-in, which yields initial interest confusion under the Lanham Act. Put another way, neither the savvy of some Internet users, nor the actual content of Long Bow's actual page, if one goes to that page, permits Long Bow to design a listing that will initially confuse Internet users. Given that Jenzabar's established trade name served as the highlighted title path to the Internet listing, where the name Long Bow is hidden, the visual appearance of the Internet listing is obviously likely to confuse as a matter of law under the Lanham Act.

3. *Long Bow's intent to confuse potential Jenzabar customers.* From all that appears, Long Bow deliberately designed its listing to exploit the Jenzabar trademark and confuse Internet users. "A defendant's intent to confuse constitutes probative evidence of likely confusion: Courts assume that the defendant's intentions were carried out successfully" (footnote omitted). *Playboy Enterprises, Inc.* v. *Netscape Communications Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). The majority recognizes that intent to confuse creates a presumption of successful confusion. Accord *Venture Tape Corp.* v. *McGills Glass Warehouse*, 540 F.3d 56, 61 (1st Cir. 2008), cert. denied, 556 U.S. 1128 (2009) (presuming likelihood of confusion because defendant admitted intent to confuse).

As noted, Long Bow chose the unadorned, trademarked name of the Jenzabar company as the complete title of its page. Long Bow also included the Jenzabar trademark in the HTML code of its Web site, so that search engines would suggest the Long Bow site to users searching for "Jenzabar." See *Brookfield Communications, Inc.* v. *West Coast Entertainment Corp.*, 174 F.3d 1036, 1044 (9th Cir. 1999). These undisputed facts are sufficient to establish for summary judgment analysis that Long Bow designed its listing to create initial interest confusion in Jenzabar's potential customers and, thus, that Long Bow's listing was likely to confuse.

As the Boston Patent Law Association (BPLA) notes in its amicus brief, an Internet diverter (Long Bow) may violate the Lanham Act even though it may have a public, political, or nonprofit motive and does not commercially compete for business with the trademark holder (Jenzabar). Phrased differently, using a trademark to trigger confusing Internet links constitutes trademark infringement, even absent direct competition or a commercial motive because competition is not a prerequisite for relief under the Lanham Act. See *Mobil Oil Corp.* v. *Pegasus Petroleum Corp.*, 818 F.2d at 257-258; *Niton Corp.* v. *Radiation Monitoring Devices, Inc.*, 27 F. Supp. 2d 102, 103 (D. Mass. 1998). "Confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement." *Mobil Oil Corp.* v. *Pegasus Petroleum Corp.*, *supra*. Accord *Dr. Seuss Enterprises, L.P.* v. *Penguin Books USA, Inc.*, 109 F.3d at 1404.[2] Nor is it necessary that the defendant have a profit motive. See *SMJ Group, Inc.* v. *417 Lafayette Restaurant LLC*, 439 F. Supp. 2d 281, 289 (S.D.N.Y. 2006).

Further, as the BPLA points out, this case implicates the usability of the Internet. In the BPLA analysis, to dismiss the

---

[2]This whimsical, but solid Lanham Act case is described by BPLA as follows:

> "In *Dr. Seuss*, the Ninth Circuit considered a book about the O.J. Simpson trial that made significant use of plaintiff's trademarks to mimic the style of the plaintiff's Cat in the Hat book. See 109 F.3d 1394. The court found that 'the use of the Cat's stove-pipe hat or the confusingly similar title to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may still be an infringement.' *Id.* at 1405."

Jenzabar claim would, in effect, allow Long Bow, as a third party, to trade on any Internet good will earned by Jenzabar to divert Internet users, either directly or indirectly, to the Long Bow Internet site. By including Jenzabar's trademark in keyword "metatags" and in the title of the link to its page, Long Bow practiced a form of "Internet search engine optimization." The prominent display of a link to Long Bow's Web site following a point of origin search for "Jenzabar" optimized the functioning of the search engine tool — to the benefit of Long Bow — by the good will of Jenzabar's established trademark. Search engine optimization — the use of specific keywords and metatags to increase the visibility of a Web page in a list of search results — is implicated when ambiguous title tags or poorly labeled text describe the search result link or the displayed advertisement, as is the case here with the ambiguous Long Bow link, which uses only the name Jenzabar, and not Long Bow. This is wrong.

I believe this case presents a matter of import because of the growing significance of Internet search engines in trademark law. I dissent from the majority's holding that the Lanham Act is not violated by Long Bow's confusing use of Jenzabar's trademark. Therefore, I dissent from the affirmance of summary judgment.

APPENDIX.

Web  Images  Videos  Maps  News  Shopping  Gmail  more ▼          Search settings | Sign in

Google  jenzabar          [ Search ]  Advanced Search

Web  ⊞Show options...          Results 1 - 10 of about 86,000 for jenzabar. (0.09 seconds)

**Jenzabar :: Software, Strategies, Services for Higher Education**
Jenzabar provides innovative software, strategic expertise, and client-tailored services to
colleges and universities, helping schools meet enrollment, ...
www.jenzabar.com/ - Cached

| Careers at Jenzabar | Cincinnati Office |
| Executive Team | Harrisonburg Office |
| JAM 2010 | Knoxville Office |
| Boston Office | Jenzabar CX |

More results from jenzabar.com »

**Jenzabar :: Executive Management Team**
Jenzabar's executive management team is led by Chairman and CEO Robert Maginn and
President and COO Ling Chai.
www.jenzabar.com/aboutus.aspx?id=80 - Cached

**Jenzabar**
The information on these pages about Chai Ling and Jenzabar, the software company she ◄─
runs with her husband, Robert Maginn, contains excerpts from and links ...
www.tsquare.tv/film/jenzabar.html - Cached

Link to the Long Bow
Web site appearing
on the first page of
Google.com search
results for the term
"Jenzabar" (Record
Appendix at 1218)

**Foundation Homepage | The Jenzabar Foundation**
Mar 3, 2009.... The Jenzabar Foundation announces its official status as a public charity.
This new authorization allows The Foundation to raise additional ...
www.thejenzabarfoundation.org/ - Cached - Similar

**Home | MyJenzabar.net**
MyJenzabar.net is a resource center and a community where you can learn, contribute and
realize the benefits that Jenzabar products have to offer. ...
www.myjenzabar.net/ - Cached - Similar

**Jenzabar Says That Google Blog Post Is 'Hearsay', Not Official ...**
Last month, we wrote about the highly troubling efforts by the head of software firm
Jenzabar to abuse trademark law to stifle criticism of that company's ...
www.techdirt.com/articles/20091106/0339376831.shtml - Cached

**Jenzabar, Inc. (Jenzabar) on Twitter**
Jenzabar®, Inc., is a leading provider of enterprise software, services and strategies
exclusively for higher education, offering 35 years of experience.
twitter.com/jenzabar - Cached - Similar

**Jenzabar :: The Jenzabar Foundation**
Apr 14, 2009 ... The Jenzabar Foundation issues student service grants to recognize and
support the good works and humanitarian efforts of student leaders ...
www.jenzabar.net/foundation.aspx - Cached - Similar

**CL&P Blog: Jenzabar Joins Trademark Abusers Hall of Shame**
Oct 13, 2009 ... Jenzabar, a company that makes software systems for colleges and
universities, has joined the trademark abusers' hall of shame by ...